IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

CATHERINE DRYER,

                Plaintiff,                Case No. 3:04 CV 7631

    -vs-                                         <u>MEMORANDUM   OPINION</u>

FLOWER HOSPITAL,

                Defendant.

KATZ, J.

      This matter is before the Court on Defendant Flower Hospital's ("Flower Hospital" or "Hospital") Motion for Summary Judgment (Doc. No. 9) and Defendant's Motion for Summary Judgment as to Plaintiff's Americans with Disabilities Act Claim (Doc. No. 6).  Plaintiff Catherine Dryer ("Dryer") has filed a response (Doc. No. 10) and a supplement thereto (Doc. No. 17-1).  Defendant has filed a Reply (Doc. No. 20).  This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 over the Americans with Disabilities Act (ADA), 42 U.S.C. §12101 *et seq*., claims and supplemental jurisdiction over all other claims pursuant to 28 U.S.C. § 1367(a).  For the foregoing reasons, the Court grants Defendant's motions.

**BACKGROUND**

      On January 31, 2003 Dryer filed a negligence claim against Flower Hospital in state court (Doc. No. 1, Attachment 1, Exhibit A), which was amended on September 27, 2004 to include claims under the ADA (Doc. No. 1, Attachment 1, Exhibit B).  On October 7, 2004, Flower Hospital filed a Notice

of Removal under 28 U.S.C. §1441 (Doc. No. 1), which was granted on October 14, 2004 (Doc. No. 4).

Dryer suffers from Chronic Obstructive Pulmonary Disease ("COPD"), a disease which inhibits lung function.[1] (Doc. No. 17-3, Consultation, pg. 1). As a result of this condition, she has been prescribed oxygen to assist with her breathing. (Doc No. 9-2, Deposition of Catherine Dryer at 24). In addition to an oxygen tank for long-term home use, *id*. at 39, Plaintiff has portable tanks, which hold four hours worth of oxygen, *id.* at 38.

On April 3, 2002, Dryer's husband was admitted to Flower Hospital pending admission to Hospice. (Doc. No. 17-3, Consultation, pg. 1). Over the course of the next week, Plaintiff spent between twelve and fourteen hours a day in his hospital room. (Dryer at 24). She brought her oxygen tank to the Hospital daily, but due to the tank's limited capacity she consistently ran out of oxygen. *Id.* at 24-25. Flower Hospital has oxygen ports installed in hospital rooms to facilitate the administration of oxygen, and the room in which Dryer's husband was staying had two such ports. *Id.* at 27. These ports required the installation of an oxygen flow meter before they were usable. (Deposition of Mary Koepfer at 8-9). These meters were kept in a locked room that was accessible only to Hospital staff. *Id.* at 10. On some occasions, members of the respiratory staff assisted Dryer in hooking her breathing apparatus into the oxygen port in her husband's room. (Dryer at 26-27). However, Hospital staff ultimately told Dryer it was against Hospital policy to allow non-patients to use in-room oxygen ports. (Doc. No. 1,

---

[1] Chronic Obstructive Pulmonary Disease ("COPD") is a disease characterized by chronic bronchitis or emphysema and airflow obstruction that is generally progressive and may be accompanied by airway hyperreactivity. The Merck Manual of Diagnosis and Therapy 568 (17th ed. 1999)

2

Exhibit R, Deposition of Laura Lane at 12). A physician, Dr. Joel Retholz, offered to write a prescription allowing Dryer access to the ports (Doc. No. 20, Deposition of Joel Retholz at 7) but this request was denied as well, since Dryer was not herself a patient of the Hospital. On April 13, 2002, while at the Hospital, Dryer experienced difficulty breathing and went to the emergency room, where she was personally admitted to Flower. (Doc. No. 17-3, Discharge Summary, pg 1). She was placed on a respirator and hospitalized until April 20, 2002. (Doc. No. 17-3, Consultation, pg. 1).

## DISCUSSION

*A. Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there

3

is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus Co. v. Zenith Radio Corp.* 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belnap*, 154 F. Supp. 2d 1069 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. United States*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted to judge the evidence or make findings or fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgement "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; see also *Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

*B. Americans with Disabilities Act Claims*

Title III of the ADA prohibits discrimination against individuals "in the full and equal enjoyment of . . . any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). For purposes of Title III, a hospital is expressly among the "private entities" that are considered public accommodations where discrimination is prohibited. 42 U.S.C. §12181(7)(F).

Under the law, discrimination includes: "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford . . . goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations," 42.U.S.C. §12182(b)(2)(A)(ii), and "a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden," 42 U.S.C. § 12182(b)(2)(A)(iii).

*1. Disability*

The initial determination is whether Dryer was "disabled" so as to fall under the protections of the ADA. To be considered disabled, Dryer must meet three essential elements. First, her condition must constitute a mental or physical "impairment," second, the impairment must impact one or more "major life

5

activities," and third, the impairment must "substantially limit" the major life activities identified. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998).

A physical or mental "impairment," in this context, includes any condition affecting the body's respiratory or cardiovascular system. 28 C.F.R. § 35.104(4)(1)(i)(A). Dryer's COPD is a disease that affects her respiratory system. Additionally, she has a history of coronary artery disease and possible congestive heart failure, (Doc. No. 17-3, Consultation, pg. 2), which would affect her cardiovascular system.[2] As a result, Dryer can show that she has an impairment.

"Major life activities" *per se* are defined in 28 C.F.R. § 35.104(4)(2), and include performing manual tasks, walking and breathing. COPD is a disease that, by its nature, affects Dryer's ability to breathe. It can also affect her ability to perform manual tasks and to walk, as attested to by her physician. (Doc. No. 17-2, Affidavit of Frank Horton). Her condition, therefore, impacts major life activities.

The final step in the analysis is whether the impairment "substantially limits" major life activities. A substantial limitation is in place when "the individuals' important life activities are restricted as to the conditions, manner or duration under which they can be performed in comparison to most people." 28 C.F.R. §§ 35.104 App. A. Furthermore, the Sixth Circuit has held that an impairment is substantially limiting if it makes an individual unable to perform a major life activity or severely restricts the individual's ability to perform a major life activity as compared to the general population. *Gonzales v. Nat'l Bd. of*

---

[2] Coronary artery disease is a condition in which fatty deposits accumulate in the cells lining the wall of a coronary artery and obstruct the blood flow. <u>Merck Manual of Medical Information - Home Edition</u> 121 (1997). Congestive heart failure is a serious condition in which the quantity of blood pumped by the heart each minute (cardiac output) is insufficient to meet the body's normal requirements for oxygen and nutrients. *Id*.

6

*Med. Exam'rs.*, 225 F.3d 620, 626-27 (6th Cir. 2000). Within the substantial limitation framework however, the Supreme Court has held that an individual's ability to self-accommodate or self-correct through medication or treatment must be considered in determining whether that person is "disabled." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 488-489 (1999); *see also Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521 (1999); *Albertson's Inc. v. Kirkingburg* 527 U.S. 555, 565 (1999).

*Sutton* involved two prospective airline pilots with severely myopic vision, but whose eyesight could be corrected by the use of contact lenses to better than 20/20. While "a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, . . . if the impairment is corrected it does not 'substantially limit' a major life activity." *Sutton*, 527 U.S. at 483. Ultimately the court found that "[t]he use or nonuse of a corrective device does not determine whether an individual is disabled; that determination depends on whether the limitations an individual with an impairment *actually* faces are in fact substantially limiting." *Id.* at 488. In *Murphy*, a truck driver with hypertension, whose high blood pressure was successfully controlled by medication, also was not deemed substantially limited. *Murphy*, 527 U.S. at 521. Finally, *Kirkingburg* involved a truck driver with amblyopia, an uncorrectable condition that essentially left him with sight in only one eye, yet whose body and brain had adapted such that he made accommodations for the impairment. *Kirkingburg*, 527 U.S. at 558-559. The Court held that adaption through natural, medical, pharmacological or therapeutic methods should all be considered in determining if a substantial limitation was in place. *Id.* at 565-566.

In the case before the court today, Dryer has a prescription to use an oxygen tank to assist her in breathing. This tank, in and of itself, is a mitigating measure to alleviate the symptoms of COPD. However, even with the assistance of the tank, Dryer is still substantially limited in the distance she can

7

travel, the time she can spend away from her home and, ultimately, the tasks she can accomplish. She can be without prescribed oxygen for no more than an hour at a time. (Dryer at 41). She can spend between four and six hours away from home with one tank of oxygen- any more time away requires her to haul multiple tanks with her. *Id.* 39-40. Because of the weight of the oxygen tank, she is unable to carry it on her own, and someone must assist her. *Id.* at 41. As a result of the COPD, even with the oxygen prescription, she is unable to do her own housework, go shopping on a regular basis, or take part in the leisure activities she enjoyed *Id.* at 42-44. These are all factors which indicate a severe restriction of her activities as compared to the general population.

Thus, Plaintiff has fulfilled all three required elements, and has demonstrated that a jury could conclude she is "disabled" under the ADA. As a result, the Court must now determine whether Flower took part in any discriminatory actions prohibited by the law.

### 2. Plaintiff's ADA Claims

Plaintiff alleges that Defendant violated the ADA by failing "to make reasonable modifications in policies, practices, or procedures" under 42.U.S.C. §12182(b)(2)(A)(ii), and by failing to provide an auxiliary aid under 42 U.S.C. § 12182(b)(2)(A)(iii).

The Supreme Court has emphasized that in considering a "reasonable modification" claim, "an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001)

The Sixth Circuit considered a "reasonable modification" claim in *Jones v. City of Monroe, Michigan*, 341 F.3d 474 (2003). In *Jones*, the City of Monroe supplied free, one-hour parking spaces, both disabled and non-disabled, for shoppers in the downtown district. *Id*. at 475. For employees who worked downtown, Monroe also supplied free, all-day parking a block or two away, again with both disabled and standard spaces. *Id*. Jones, a downtown employee, parked her car on numerous occasions in the one-hour space next to her office, and left it there for the entire work day. *Id*. She was ticketed, and brought suit. *Id*. The Sixth Circuit allowed Monroe's parking system to continue, stating that "[w]aiver of the ordinance limiting parking to one hour in the business district would be 'at odds' with the fundamental purpose of the rule," and "[a]n accommodation is not reasonable if it imposes a fundamental alteration in the nature of the program." *Id.* at 480. Further, "[i]n cases involving waiver of applicable rules and regulations, the overall focus should be on 'whether waiver of the rule in the particular case would be so at odds with the purposes behind the rule that it would be a fundamental and unreasonable change.'" *Id.* (citing *Dadian v. Village of Wilmette*, 269 F.3d 831, 838-39 (7th Cir. 2001)).

The nature of Flower Hospital is to offer care to patients at the Hospital, i.e., those who are admitted for the purpose of treatment and have medical personnel in the Hospital that are responsible for their well-being. *Cf*. Ohio Rev. Code § 3727.06. This care includes the administration of oxygen and other prescribed substances. Requiring the Hospital to administer medications to individuals who are not patients of the Hospital, those whose purpose at the Hospital is not treatment but visitation, and individuals with no one at the Hospital responsible for their care, would fundamentally alter the basic rule

9

that hospitals care for *patients*. Since allowing Dryer to access the oxygen would change the nature of Flower's program, it is not a reasonable accommodation.

*Jones*, in considering reasonableness, also considered that alternatives were available to the disabled woman, including personal transportation based on an individualized schedule that would drop Jones off at the door of her workplace. *Jones*, 341 F.3d at 481. Accordingly, the Sixth Circuit found, "Jones's requested modification . . . is not a reasonable accommodation required under the ADA." *Id*.

Here, Mrs. Dryer had oxygen tanks which were prescribed and available to her at her home only ten minutes away. (Dryer at 24, 42). These tanks were portable and available for transport to the Hospital. *Id.* at 24. However, Mrs. Dryer refused to bring an adequate supply of oxygen to the Hospital, instead relying on Flower's oxygen ports from the beginning of her husband's hospital stay. *Id*. at 25. Here, as in *Jones*, the alternatives available to Mrs. Dryer indicate that her requested modification to Flower's policy would be an unreasonable accommodation. As a result of the fundamental alteration and the possible alternatives, it was not a reasonable accommodation for Plaintiff to be allowed use of the oxygen.

Necessity, the next determination, is also not present. While Dryer required a supplemental oxygen supply in order to breathe, *providing* that oxygen was not necessary to the Hospital's allowing her to visit her husband. The Hospital was instead required to allow her to bring enough to fulfill her needs, and they did just that. Security at the Hospital never prevented Dryer from bringing in her own oxygen supply, and the medical staff did not forbid her from taking her own prescribed oxygen tanks into the hospital room where she was visiting her husband. In fact, members of the nursing staff encouraged Dryer to bring in her own oxygen from home. (Lane at 11).

As Plaintiff points out in her opposition to Defendant's revised motion for summary judgment (Doc. No. 17-1), Title III regulates *access to*, but not the *content of* what is provided. *Martin*, 532 U.S. at 682-91; *see also Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006, 1012 (6th Cir. 1997). In *Parker*, the Sixth Circuit found that an employer-provided disability plan that offered a higher cap on benefits for those suffering from physical disabilities than those suffering from mental disabilities was acceptable. *Parker*, 121 F.3d at 1008. Quoting the Department of Justice, the Sixth Circuit reinforced that "'[t]he purpose of the ADA's public accommodations requirements is to ensure accessibility to the goods offered by a public accommodation, not to alter the nature or mix of goods that the public accommodation has typically provided.'" *Parker*, 121 F.3d at 1012 (quoting 28 C.F.R. pt. 36, app. B at 630).

This requirement dictates that Flower allow Dryer safe and secure access to the building, to common areas, and to her husband's room. It does not require specialized content that must be provided; be it a bottle for an infant visitor, a walker for an individual with ambulatory problems, or oxygen or other prescribed substances for Mrs. Dryer and other visitors who require them. The Hospital has not typically provided those goods to visitors, and while they might be necessary to abate hunger, assist in walking, or allow symptomatic or conditional relief, they are not necessary for what the Hospital normally supplies to visitors, that is, access to visit patients who have been admitted to the Hospital.

Plaintiff next alleges that allowing Dryer to access the oxygen ports was an auxiliary aid, as discussed and required in 42 U.S.C. §12182(b)(2)(A)(iii). Auxiliary aids can include, but are not limited to, accommodations such as Braille menus or closed captioned televisions. 42 U.S.C. §12102(1). However, public accommodations are not required to provide "personal devices, such as wheelchairs;

11

individually prescribed devices, such as prescription eyeglasses or hearing aids; or services of a personal nature including assistance in eating, toileting, or dressing." 28 C.F.R. § 36.306.  In the case before the Court today, that is exactly what Plaintiff required: an *individually prescribed device*.  The ADA does not require public facilities in which there are no medical supplier/patient relationships to supply individuals with medical prescriptions under the guise of auxiliary aids.  Just as a restaurant is not required to stock and dispense pain medication to a chronic pain patient if the patron has run out of medication, a hospital must not be required to administer an individually prescribed device to an individual who is not a patient of the hospital.

As Defendant asserts and Plaintiff acknowledges, the ADA allows only injunctive relief, and not the award of damages, for a violation.  Thus, even if Defendant did engage in discrimination against Plaintiff, she would be unable to recover monetary damages.  Plaintiff is instead bringing the ADA claims because "a violation of an administrative rule may be admissible as evidence of negligence."  *Chambers v. St. Mary's School*, 697 N.E.2d 198, 203 (Ohio 1998). However, Plaintiff cannot show that Defendant has violated the ADA.

C. *Negligence Claims*

The elements of an ordinary negligence suit between private parties are: (1) the existence of a legal duty, (2) the defendant's breach of that duty, and (3) injury that is the proximate cause of the defendant's breach. *Mussivand v. David*, 544 N.E.2d 265, 270 (Ohio 1989).  A "duty" is an obligation imposed by law on one person to act for the benefit of another person due to the relationship

12

between them. *Berdyck v. Shinde*, 613 N.E.2d 1014, 1020 (Ohio 1991). The duty element is a question of law for the court to determine. *Mussivand,* 544 N.E.2d at 270.

A person who visits a relative in a hospital is an "invitee" under Ohio law. *Stinson v. Cleveland Clinic Found.*, 524 N.E.2d 898, 901 (Ohio Ct. App. 1987); *see also Bowins v. Euclid Gen. Hosp. Ass'n*, 484 N.E.2d 203, 205 (Ohio Ct. App. 1984). As an invitee, Plaintiff was owed a duty of "ordinary care" by the Hospital. *Presley v. Norwood*, 303 N.E.2d 81, 83 (Ohio 1973). Once the duty has been established, this Court must determine if a breach has occurred.

"Ordinary care" means that the Hospital was required to maintain its facilities in a safe condition, eliminating any conditions comprising an unreasonable risk of harm to visitors, including Dryer. *Crane v. Lakewood Hosp*. 658 N.E.2d 1088, 1093 (Ohio Ct. App. 1995). In order to exercise its duty of care towards persons visiting patients on its premises, Ohio law requires that the Hospital "'take into account that the aged and infirm as well as the young and robust [would] visit' the hospital." *Id*. (citing *Campbell v. Hughes*, 90 N.E.2d 694, 695 (Ohio 1950)) (alteration in *Crane*). Thus, the Hospital had a duty to exercise reasonable care in selecting furnishings that were suitable for individuals of all strengths and capacities. *Id.* Ordinary care might also include maintenance of adequate flooring and hand rails to help prevent trip and fall accidents.

This duty of ordinary care does not include a responsibility to provide Dryer with the medical care or treatment that is reserved for patients, individuals in a special relationship with the Hospital. In this case, ordinary care requires the Hospital to offer a safe environment in which Dryer could visit her

13

husband. The Hospital did so. As a result, Flower Hospital did not breach the duty it owed to Dryer, as an invitee, while she was visiting her husband, and negligence cannot be shown.

Plaintiff also claims that the Defendant, through its nursing staff, owed a duty to supply Dryer with oxygen after it was ordered by a physician. In support of this proposition, Plaintiff relies on *Berdyck*, 613 N.E.2d 1014. The issue in *Berdyck*, as framed by the court, was determining the duty of care "owed by a nurse to a patient who is <u>admitted</u> under the care of an attending physician to a hospital at which the nurse is employed." *Id.* at 1020 (Emphasis added). As an answer, the court concluded that a nurse is "required to assist the physician [by fulfilling his orders] when the hospital admits the patient for that purpose at the physician's order or request. . . ." *Id.* at 1021. Finally, the court recognizes that "hospitals, and the nurses they employ, owe a duty to every patient whom they admit." *Id*. at 1024.

Repeatedly, the *Berdyck* court emphasized that the patient must be <u>admitted</u> to the hospital before a duty is present, rather than applying the duty more generally to members of the public. In the case before the Court today, Dryer was not admitted to Flower Hospital when Dr. Retholtz wrote out the prescription for oxygen (Dryer at 9, Reholtz at 5-6). Thus, no superior duty was in place between the nurses at Flower Hospital and Dryer. Because there was no duty, there can be no negligence.

Finally, Plaintiff argues that the Defendant assumed a hospital-patient relationship when certain nurses administered oxygen to Plaintiff, and a duty results from that relationship. However, only a doctor may admit a patient to a hospital. Ohio Rev. Code § 3727.06. Moreover, while the gratuitous acts of Flower employees who administered oxygen to Dryer on certain occasions may have given rise to a duty to use due care in performing the gratuitous acts on those occasions, *Briere v. Lathrop Co.*, 258

14

N.E.2d 597, 602 (Ohio 1970), such acts would not give rise to an ongoing duty to administer oxygen when Dryer returned to Flower on other occasions, *see* Restatement (Second) of Torts § 323 cmt. c (1965) *cited with approval in Briere*, 258 N.E.2d at 602. As the Restatement of Torts explains, one who undertakes to gratuitously aid another need not continue his efforts indefinitely, but may cease when he leaves the other person no worse than he found that person, and where the person in need has not foregone other opportunities for assistance in reliance on the gratuitous help. *Id*; *see also Northwest Airlines, Inc. v. Glenn L. Martin Co.*, 224 F.2d 120, 128 (6th Cir. 1955) (holding that reasonable reliance upon a gratuitous undertaking is a prerequisite to the duty to complete the undertaking with due care). There is no evidence that Dryer failed to pursue other options for obtaining oxygen in reliance on her occasional ability to use Flower's. Moreover, Dryer could not have reasonably relied on the past conduct of Flower's employees after being informed that she would no longer be permitted to use Flower's oxygen, as she was prior to the episode that precipitated her claims. Therefore, Dryer cannot show that a hospital-patient relationship was established, or that a special duty was in place.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. No. 9) and Defendant's Motion for Summary Judgment as to Plaintiff's ADA claims (Doc. No. 6) are granted.

IT IS SO ORDERED.

      s/ *David A. Katz*
      DAVID A. KATZ
      U. S. DISTRICT JUDGE